**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

2026 APR -7 AM II: 20

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY _____ CL _____
DEPUTY

| | |
|---|---|
| Doe/Podslurp, | ) |
| | ) |
| Movant, | ) |
| v. | ) |
| | ) Misc. Case No. |
| UNITED STATES DEPARMENT OF | ) |
| HOMELAND SECURITY, | ) |
| | ) |
| Respondent. | ) |
| | ) |

1:26MC00861 RP

## DOE/PODSLURP'S MOTION TO QUASH SUMMONS
## AND FOR A PROTECTIVE ORDER

*Attorneys for Doe/Podslurp*

Robert P. Latham, Esq.
**JACKSON WALKER L.L.P.**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6095

Erica Benites Giese, Esq.
**JACKSON WALKER L.L.P.**
1900 Broadway, Suite 1200
San Antonio, Texas 78215
Telephone: (210) 978-7791

Joshua Koltun (Cal. Bar No. 173040)
One Sansome Street
Suite 1400, No. 2544
San Francisco, California 94104
Telephone: (415) 680-3410
*Application pro hac vice to be made forthwith*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.    The identity and home address of Jonathan Ross, the ICE Agent who shot and killed Renee Good in Minneapolis, was indirectly disclosed to the public by statements and actions of DHS ................................................. 2

    B.    It was reported that online fundraisers had made Ross a millionaire; Doe sarcastically commented that Doe will send Doe's donation directly to Ross's home address rather than launder it through fundraisers ............... 4

    C.    DHS issues an administrative summons under 19 U.S.C. § 1509 to learn Doe's identity. ................................................................................ 4

ARGUMENT ..................................................................................................................... 5

    I.    Congress has not given DHS the statutory authority to use a section 1509 summons to learn the identity of an anonymous speaker such as Doe ................... 5

        A.    A Section 1509 summons is for investigations of customs-related issues such as duties, tariffs, contraband and similar matters. ............................... 5

        B.    DHS has shown a pattern of misusing Section 1509 subpoenas for unauthorized purposes ........................................................................ 8

        C.    Even if one accepts DHS's broad reading of section 1509, it does not permit the use of a section 1509 summons to investigate Doe's identity... 9

    II.    Any interest DHS may have in learning Doe's identity cannot overcome Doe's First Amendment interest in remaining anonymous ............................................ 10

        A.    If the target of a government investigation can show that compliance would arguably infringe his First Amendment rights, the burden shifts to the government to show that it has an interest that is sufficiently compelling to outweigh the First Amendment interest ............................. 10

        B.    Doe has a strong First Amendment interest in remaining anonymous ..... 12

        C.    DHS cannot show an interest in identifying Doe sufficiently compelling to outweigh Doe's First Amendment Rights, especially since the conduct it purports to investigate is fully protected by the First Amendment .......... 14

            1.    Doe's Comment cannot be a violation of 18 U.S.C. § 119, because Ross's address was already public when Doe referenced it ......... 14

ii

Motion to Quash Summons and for Prot. Order

2.    Doe's republication of truthful information concerning Ross is protected by the First Amendment ...............................................15

3.    Doe's Comment did not constitute a "true threat" to Ross ...........16

4.    Doe's Comment cannot be deemed to have incited others to harm Ross .......................................................................................17

CONCLUSION ................................................................................................20

Motion to Quash Summons and for Prot. Order

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1213-14 (10th Cir. 2007) ...................................... 16

*Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 616, (2021) ................................................ 11

*Art of Living Found. v. Does*, 2011 U.S. Dist. LEXIS 129836 (N.D. Cal. 2011) ................... 12, 14

*Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002 ............................................................ 18

*Australia/Eastern U. S. A. Shipping Conference v. United States*, 1981 U.S. Dist. LEXIS 10121,
   at *50 (D.D.C. Dec. 23, 1981) ................................................................................................ 12

*Bates v. City of Little Rock*, 361 U.S. 516, 525 (1960). .............................................................. 11

*Brandenburg v. Ohio*, 395 U.S. 444, (1969) ............................................................................... 18

*Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988)). .......................................... 18

*Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1247 (N.D. Fla. 2010) ................... 15, 19

*Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349-50 (9th Cir. 1988) ........... 10

*Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 638 (5th Cir. 1993). 6

*Counterman v. Colorado*, 600 U.S. 66, 74 (2023) ...................................................................... 17

*Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-9 (1975) ............................................................. 15

*Dole v. Serv. Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1459 (9th Cir. 1991) ..... 14

*Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982) .............................................. 11

*Florida Star v. B. J. F.*, 491 U.S. 524, 538-89 (1989) ................................................................ 16

*Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 & n.11 (2d Cir. 2004) .................................. 15

*Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1022 (5th Cir. 1987). ................................... 18

*In re Grand Jury Subpoena Issued to Twitter*, 2017 U.S. Dist. LEXIS 234352, at *36-37 (N.D.
   Tex. Nov. 7, 2017) ................................................................................................................... 11

*Lee Tin Mew v. Jones*, 268 F.2d 376, 377 (9th Cir. 1959) ......................................................... 8, 9

*McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) ................................................. 10

*NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) ........................................... 10, 11

*Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 659-60 (1989) ...................................... 7

*NLRB v. Midland Daily News*, 151 F.3d 472, 475 (6th Cir. 1998) .............................................. 12

*Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018) ....................................................... 18, 19

*Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09, 66 S. Ct. 494, 505-06 (1946) ............... 6

*Okla. Publ'g Co. v. Dist. Ct.*, 430 U.S. 308, 311-12 (1977) ...................................................... 16

*Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) .................................. 10, 11, 12, 13

*Publius v. Boyer-Vine*, 237 F. Supp. 3d 997 (E.D. Cal. 2017) ................................................... 15

*Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1139 (W.D. Wash. 2003) ................................... 15, 19

*Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 105 (1979) ( ................................................. 15

*Snyder v. Phelps*, 562 U.S. 443, 453 (2011) .............................................................................. 18

*State ex rel. Cin. Enquirer v. Shanahan*, 2022-Ohio-448, ¶¶ 35-42 ............................................ 16

*Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 463 (5th Cir. 1990) .................................. 18

*United States v. Grayson Cty. State Bank*, 656 F.2d 1070, 1074 (5th Cir. 1981) ........................ 11

*United States v. Minker*, 350 U.S. 179, 190 (1956) ..................................................................... 8

*United States v. Powell*, 379 U.S. 48, 58 (1964) ......................................................................... 6

*Watts v. United States*, , 394 U.S. 705, 706 .............................................................................. 17

iv

Motion to Quash Summons and for Prot. Order

*Whole Woman's Health v. Smith*, 896 F.3d 362, 372-73, 75-76 (5th Cir. 2018) .................... 10, 14

*Yates v. United States*, 574 U.S. 528, 543-46 (2015) ................................................................ 6, 7

## Statutes

8 U.S.C. § 1225 ............................................................................................................................ 8

18 U.S.C. § 119 ......................................................................................................................... 14

19 U.S.C. § 1509 ................................................................................................................. passim

## Other Authorities

Office of Inspector General, DHS, *Management Alert – CBP's Use of Examination and
    Summons Authority Under 19 U.S.C. § 1509* ............................................................. 8

## Rules

Local Rule CV-7(c)(2) ................................................................................................................. 1

Motion to Quash Summons and for Prot. Order

Movant Doe/Podslurp ("Doe") is an individual who uses the pseudonym "podslurp" on X (formerly Twitter). Doe moves this Court for an order quashing the administrative summons issued by the Department of Homeland Security ("DHS") to X Corp. ("X") dated February 27, 2026, and for a protective order barring the government from seeking to discover Doe's identity without leave of this Court.[1]

## PRELIMINARY STATEMENT

This case arises from a sarcastic comment that Doe made anonymously on X (formerly Twitter) in which Doe referenced the home address of Jonathan Ross, the ICE Agent who shot and killed a protester, Renee Good, in Minneapolis. That information was already public at the time Doe made the comment. DHS has sought to use a summons to X under 19 U.S.C. § 1509 ("Section 1509") to strip Doe of anonymity and investigate Doe.

Section 1509 summons are authorized to be used solely with respect to customs-related matters, e.g. tariffs, duties, contraband, and so forth. The statute does not authorize such summons to be used to investigate speech. DHS has a pattern of improperly using Section 1509 summons. Moreover, Doe has a First Amendment right to speak anonymously and, in particular, to anonymously criticize the government. Doe's sarcastic comment violated no law and is fully protected by the First Amendment. The Court should quash the summons and issue an order that X not disclose Doe's identity without leave of Court.

---

[1]Counsel for Doe have been unable to meet and confer with DHS because X redacted the summons it sent to Doe, removing the identity of the issuing Special Agent, and because prior to filing this Miscellaneous matter no Assistant U.S. Attorney has been assigned.

The Clerk has confirmed to counsel that this motion initiating a Miscellaneous matter is not deemed to be a discovery matter under Local Rule CV-7(c)(2).

1

Motion to Quash Summons and for Prot. Order

## BACKGROUND

### A.     *The identity and home address of Jonathan Ross, the ICE Agent who shot and killed Renee Good in Minneapolis, was indirectly disclosed to the public by statements and actions of DHS*

Starting last year, agents of the Immigration and Customs Enforcement ("ICE") and the Customs and Border Protection ("CBP") began conducting sweeping raids around the country in which they seize and arrest persons that they allege are unlawfully present in the United States. This has attracted intense public attention and controversy, and protests have occurred wherever such sweeps have been conducted. The controversy over ICE/CBP's methods and use of force has continued to this day, so much so that it has led, at least temporarily, to a Congressional impasse over whether, or under what conditions, ICE or CBP are to be funded at all.

The national controversy, already extremely intense, was inflamed when, on January 7 of this year, an ICE agent shot and killed protester Renee Good in Minneapolis. That sparked pervasive media coverage, intense scrutiny, and online debate as to whether the shooting was justified.

On January 8, Kristi Noem, then-Secretary of Homeland Security, publicly described how the ICE Agent, who had been wearing a mask and whose identity was not publicly known at the time, had been rammed by a car and dragged by an anti-ICE protester the previous June. Koltun Decl., ¶ 4, Exh. C. Vice President Vance excoriated the media for "leav[ing] out the fact that that very ICE officer nearly had his life ended, dragged by a car, six months ago, 33 stitches in his leg." *Id.* Those details made it easy for journalists and other online commentators to determine the identity of the agent. *Id.,* Exhs C-L.

That same day, the local and national media reported on the information that Noem and Vance had disclosed, together with information concerning that prior incident. *Id.* The case records from that incident, which the media also posted online, showed that the ICE Agent was named Jonathan Ross, and provided numerous details concerning his service as an ICE agent. *Id.* One media outlet clarified that the ICE Agent was Jonathan E. Ross, not Jonathan David

2

Motion to Quash Summons and for Prot. Order

Ross as it had initially reported. *Id.* Numerous identifying details concerning Ross were published within the next few days, including: photographs of him and his wife, that he had a Filipina immigrant wife named Patrixia, his father was Ed Ross of North Pekin, he had lived on the outskirts of Minneapolis since 2015, specifically, in the town of Chaska, he lived in a five bedroom house on a ten-house cul-de-sac, and various details of his and his family's social media presence. *Id.*

On January 9, the Daily Mail reported that ICE Agents had swarmed Ross's house, which was apparently now vacant, and had been removing materials. *Id.* The Daily Mail posted photographs and videos of agents removing computers and other information, which photographs and videos clearly show the house and street on which Ross lived. *Id.* This was of great public concern at the time because there was a question whether local law enforcement would be able to investigate the killing of Ms. Good. *Id.* It appeared that the federal agents were acting to take control of all evidence and prevent a state law enforcement investigation. *Id.* Over the next few days, the media interviewed Ross's neighbors who were upset to learn that he was an ICE Agent; he had told them that he was a botanist. *Id.*

Given the wealth of details that had been publicly reported, Ross's home address immediately began to circulate widely on social media, where pro- and anti-ICE comments proliferated. Doe Decl., ¶ 2. Thus, for example, DHS posted on X on January 8, alongside photographs of its masked officers in the streets:

> THE WORK CONTINUES!
>
> DHS investigations in Minneapolis are accelerating as our brave law enforcement enter the state.
>
> We will not be impeded from ending the FRAUD that has abused our nation's generosity. See you in the streets!

To which someone replied, on January 9:

> Hell yeah brothers, see you at 1120 Francesca Ct, Chaska, MN 55318 <33

*Id.,* Exh. A.

3

Motion to Quash Summons and for Prot. Order

**B.** *It was reported that online fundraisers had made Ross a millionaire; Doe sarcastically commented that Doe will send Doe's donation directly to Ross's home address rather than funnel it through fundraisers*

On the social media site X (formerly Twitter), Doe uses the pseudonym "podslurp" to make numerous comments, including satirical or sarcastic comments, on various matters, including criticizing the Trump administration. *Id.,* ¶ 1. Doe is not involved in importing or exporting merchandise in any way, nor do any of his posts on X suggest that he might be.[2] *Id.* Doe is a United States citizen and has never suggested in any post that he is illegally present in the United States. *Id.*

On January 16, a website reported that two online fundraisers had raised over one million dollars for Ross, and that he had "become a millionaire in the face of mounting pressure against him." *Id.,* ¶ 3, Exh. B. The same day, Jack Posobiec, a pro-Trump activist and commentator, posted a link to the article on X. *Id.,* ¶ C.

On January 23, Doe commented ("Comment") in response:"@JackPosobiec Sending donations directly to 1120 francesca ct chaska mn 55318 to avoid fees and ensure he gets full amount! [saluting emoji]." *Id.,* ¶ 4. Doe had learned the address from social media. *Id.* He did not intend, nor can he imagine, that his stray sardonic comment would inspire anyone to take any action, let alone any violent action, at that address. *Id.*

On February 25, presumably at the behest of DHS, X locked Doe's ability to use X and flagged the Comment. *Id.* X required Doe to remove the Comment, stating that it "Violated our Rules against Illegal and Regulated Behaviors." *Id.,* ¶ 5, Exh. D. Doe deleted the Comment and Doe's X account was restored. *Id.*

**C.** *DHS issues an administrative summons under 19 U.S.C. § 1509 to learn Doe's identity.*

Two days later, on February 27, DHS issued a summons under 19 U.S.C. § 1509 to X for various data to identify Doe. *Id.,* ¶ 6, Exh. E. The summons states that "the production of the

---

[2] This brief will use "he" for convenience, without disclosing Doe's gender.

Motion to Quash Summons and for Prot. Order

indicated records is required in connection with an investigation or inquiry to ascertain the correctness of entries, to determine the liability of duties, taxes, fines, penalties or forfeitures, and/or to ensure compliance with the laws or regulations administered by CBP and ICE." *Id.* It also states: "You are requested not to disclose the existence of this summons for an indefinite period of time. Any such disclosure will impede the investigation and thereby interfere with the enforcement of federal law. Issued under the authority of ... 19 U.S.C. § 1509." *Id.*

Late on Friday, March 20, X sent Doe an email that stated:

> X has received the attached legal process, dated 2/27/2026, regarding your X account, @podslurp. This legal process obligates X to produce information related to your account. ... Please be advised that X is required to respond to this request by 3/27/2026. If we do not receive notice from you that a motion to quash the legal process will or has been filed ...we may produce some or all of the requested information.

*Id.* The deadline was subsequently extended. Koltun Decl., ¶ 5.

## ARGUMENT

I.    ***Congress has not given DHS the statutory authority to use a section 1509 summons to learn the identity of an anonymous speaker such as Doe***

    A.    ***A Section 1509 summons is for investigations of customs-related issues such as duties, tariffs, contraband and similar matters.***

Although the summons does not indicate what it is investigating, given the timing of X's demanding the removal of the "illegal" Comment and the issuance of the summons, we can presume that it is the Comment that is being investigated.

But the summons is issued under 19 U.S.C. § 1509. That statute confers limited authority to DHS in customs investigations to seek records related to the importation of merchandise, including the assessment of customs duties. That statute does not authorize DHS to learn the identity of an anonymous speaker.

The court must determine whether an administrative subpoena/summons relates to an "investigation ... authorized by Congress, is for a purpose Congress can order, and the

documents sought are relevant to the inquiry." *Okla. Press Pub. Co. v. Walling*, 327 U.S. 186, 208-09, 66 S. Ct. 494, 505-06 (1946). An administrative subpoena, like the summons here, cannot be proper if it seeks records beyond the scope of an investigation authorized by the statute, or "if the subpoena was issued for an improper purpose, such as harassment." *Burlington N. R. Co. v. Off. of Inspector Gen., R.R. Ret. Bd.*, 983 F.2d 631, 638 (5th Cir. 1993). "Such an abuse would take place if the summons had been issued for an improper purpose, such as to harass the [target of the subpoena] or to put pressure on him to settle a collateral dispute, or for any other purpose reflecting on the good faith of the particular investigation." *United States v. Powell*, 379 U.S. 48, 58 (1964).

Section 1509 addresses customs duties. It authorizes the U.S. Customs Service to request any record that may be relevant to a customs investigation for the purpose of "1) ascertaining the correctness of any entry [of merchandise]; 2) determining the liability of any person for duties, fees, and taxes due to the United states; 3) determining liability for fines and penalties or 4) "insuring compliance with the laws of the United States administered *by the United States Customs Service*." Section 1509 (a) (emphasis added). The first three categories permit limited requests relating to imports, and obviously do not apply to a request for the identity of Doe under the present circumstances.

The fourth category is broader, but on its face is also limited to customs-related laws. Moreover, according to "traditional tools of statutory interpretation," it must be read as constrained by the narrower first three categories. *See, e.g., Yates v. United States*, 574 U.S. 528, 543-46 (2015) (rejecting "aggressive" interpretation of statute proposed by government).

Other provisions of the statute similarly constrain the scope of the summons. Section 1509(a)(2)(D) states that the "records" to be produced are those defined in subsection (d)(1)(A),

6

Motion to Quash Summons and for Prot. Order

which in turn, defines those "records" as (i) "related to imports and exports" [as to which the Section 1508 requires recordkeeping] or (ii) regarding which there is probable cause to believe that they pertain to merchandise the importation of which into the United States is prohibited."

But the summons here claims a much broader investigative scope, to wit, "an investigation ... to ascertain the correctness of entries, to determine the liability for duties, taxes, fines, [etc.] .. and/or *to ensure compliance with the laws or regulations administered by CBP or ICE.*" Doe Decl., Exh. E.(emphasis added).

The highlighted passage makes far too broad a claim of authority. The language of Section 1509 refers, instead, to "the laws or regulations administered by the Customs Service." That entity no longer exists. The responsibilities of the Customs Service, then a division of the Treasury Department, included "processing persons, carriers, cargo, and mail into the United States, collecting revenue from imports, and enforcing customs and related laws ...and the interdiction and seizure of contraband, including illegal drugs." *Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 659-60 (1989).

To be sure, some of these responsibilities have been moved over to the Department of Homeland Security, including CBP. But the enforcement of immigration laws by the predecessors to ICE and CBP never resided in the Customs Service. There is no basis for concluding that, in shifting Customs Service responsibilities, Congress intended to rewrite Section 1509 to include responsibilities that are unrelated to the customs-related investigations. The meaning of "statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader context of the statute as a whole." *Yates*, 574 U.S. at 537 (internal citation omitted).

7

Interpreting a section of the immigration code that contained a similarly broad catch-all phrase, the Supreme Court ruled that "Congress has not provided with sufficient clarity that the subpoena power granted by [that statute] extends over persons who are the subject of denaturalization investigations; therefore Congress is not to be deemed to have done so impliedly." *United States v. Minker*, 350 U.S. 179, 190 (1956) (interpreting "concerning any matter which is material and relevant to the enforcement of this Act and the administration of the [Immigration and Naturalization] Service" in 8 U.S.C. 1225(d)(4)). The Court justified its "restrictive reading" by noting that the " subpoena power is a power capable of oppressive use." *Id.* at 187 (citation omitted); *accord Lee Tin Mew v. Jones*, 268 F.2d 376, 377 (9th Cir. 1959) (quashing administrative subpoena where there was no basis to believe that the person subpoenaed was not a citizen).

**B.    *DHS has shown a pattern of misusing Section 1509 subpoenas for unauthorized purposes***

This is not the first time DHS has improperly sought to expose the identities of anonymous speakers. A 2017 report by the DHS Inspector General ("OIG") – "Management Alert – CBP's Use of Examination and Summons Authority Under 19 U.S.C. § 1509" -- found that CBP's Office of Professional Responsibility had misused that authority when it demanded records that would identify an anonymous X user, because those records are not related to importation of merchandise. Koltun Decl., ¶ 6, Exh. M. OIG concluded that CBP "may have exceeded the scope of its authority" and that it "regularly" issued customs summons "in violation of [agency] policy." *Id.* at 3-4. "[I]n instances where records are sought from third parties, such as ... social media outlets ...who are not otherwise obligated to keep records pursuant to section 1508, the issuance of a 1509 summons requires probable cause to *believe* that the *records relate* to an importation of merchandise that is prohibited." *Id.* (original emphasis) That improper attempt to identify an X user was the subject of a complaint by X (Twitter), and CBP

8

subsequently withdrew the summons. *Id.* at 2.

Similarly, attempts by DHS to learn the identity of various anti-ICE activist Instagram pages were the subject of motions to quash in the Northern District of California, including one 1509 summons to Meta. *Id.,* ¶ 2. Although DHS initially defended the summons, when it became clear at the hearing on the motion that the Court would rule that DHS did not have the claimed authority, DHS withdrew the summons and stipulated that it "will not attempt to reissue the withdrawn summonses, nor will it issue any [similar] administrative summonses or subpoenas seeking information about [the Doe] in connection with social media activity." *Id.,* ¶2, Exh. A. Recent reporting by the New York Times indicates that DHS continues frequently to improperly use these summons to investigate anonymous critics of DHS. *Id.,* Exh. B.

Significantly, here DHS improperly sought to ensure that Doe would ***not*** get notice of the existence of the summons. The summons specifically requests that X "not ... disclose the existence of this summons for an indefinite period of time. Any such disclosure will impede the investigation and thereby interfere with the enforcement of federal law," citing Section 1509.

There are, according to the reporting, platforms that (unlike X here) accede to DHS's improper request that they not notify the user of the summons. *Id.* Thus, DHS improperly obtains information about its anonymous critics using a tool Congress never intended to be used for that purpose, thereby violating their First Amendment right to speak anonymously (see Section II below), without the speaker having any opportunity to seek judicial relief.

C.     ***Even if one accepts DHS's broad reading of section 1509, it does not permit the use of a section 1509 summons to investigate Doe's identity.***

Indeed, even if one accepts DHS broad reading of the scope of investigative authority under section 1509, it simply cannot show that Doe's X post falls within the ambit of "laws or regulations administered by CBP or ICE." There is no reason to believe that Doe is not legally present in the U.S. *See Lee Tin Mew*, 268 F.2d at 377.

9

As explained in section II.C.1, Doe's inclusion of Ross's home address cannot be a violation of 18 U.S.C. section 119. But in any event, that is a criminal statute administered by the Department of Justice, not by CBP or ICE. The same goes for any other crime that DHS might argue is implicated by Doe's Comment.

**II.    *Any interest DHS may have in learning Doe's identity cannot overcome Doe's First Amendment interest in remaining anonymous***

Even if the summons were valid as a statutory matter, this Court should quash the summons, because the First Amendment protects Doe against government efforts to strip him of his anonymity. Because the First Amendment protects Doe against such infringement of his right to speak anonymously, this Court should issue an order that the government not use any other means (summons, subpoena, search warrant, etc.) to seek to discover Doe's identity without leave of this Court.

**A.    *If the target of a government investigation can show that compliance would arguably infringe his First Amendment rights, the burden shifts to the government to show that it has an interest that is sufficiently compelling to outweigh the First Amendment interest***

The First Amendment protects the right to speak anonymously and the right to associate anonymously with others. *See, e.g., McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) (speech); *NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 462 (1958) (association).

A two-part test applies when government investigations arguably impinge on First Amendment rights of those from whom compelled disclosure is sought. *See, e.g., Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 349-50 (9th Cir. 1988). The court should apply heightened scrutiny to any attempt to compel disclosure of the identity of anonymous speakers, or members of an association, if they make a *"prima facie* showing of arguable first amendment infringement," in other words, "that enforcement . . . will result in (1) harassment, membership

10

withdrawal, or discouragement of new members, or (2) other consequences which objectively suggest an impact on, or 'chilling' of, the members' associational rights." *Perry v. Schwarzenegger*, 591 F.3d 1147, 1160 (9th Cir. 2010) (citing *Brock*). Put another way, a threshold showing must be made that disclosure of identifying information "will have a deterrent effect on the exercise of protected activities." *Perry* at 1162; *accord Whole Woman's Health v. Smith*, 896 F.3d 362, 372-73, 75-76 (5th Cir. 2018) (citing *Perry* with approval and quashing subpoena that would invade autonomy of religious group and chill its willingness to engage in the "public square."); *In re Grand Jury Subpoena Issued to Twitter*, 2017 U.S. Dist. LEXIS 234352, at *36-37 (N.D. Tex. Nov. 7, 2017) (government's stated interest in investigating whether Twitter user, who had criticized FBI agent, was coordinating with another who had harassed FBI agent and his family was insufficient to overcome user's right to protect his anonymity).

Once the initial threshold showing of an arguable First Amendment infringement is made, "the evidentiary burden shifts to the plaintiffs to demonstrate a sufficient need for the discovery to counterbalance that infringement." *Perry,* 591 F.3d at 1164. This heightened First Amendment standard cannot be met merely by showing that the information "might reasonably lead to the discovery of admissible evidence." *Id.* at 1164. The government's "interest in obtaining the disclosures" must be "sufficient to justify the deterrent effect . . . on the free exercise . . . of [the] constitutionally protected right." *Id.* (quoting *NAACP,* 357 U.S. at 463).[3]

---

[3] *Accord Dow Chemical Co. v. Allen*, 672 F.2d 1262, 1276 (7th Cir. 1982) (quashing administrative subpoena to researchers from chemical company in EPA hearing where enforcement of subpoena would be "unnerving and discouraging" and would "inevitably tend[] to check the ardor and fearlessness of [the] scholars."); *United States v. Grayson Cty. State Bank,* 656 F.2d 1070, 1074 (5th Cir. 1981)(where plaintiff shows burden on free exercise of religion, "the burden will be upheld only if the government interest outweighs the degree of impairment of free exercise rights."); *see also Ams. for Prosperity Found. v. Bonta,* 594 U.S. 595, 616,

Motion to Quash Summons and for Prot. Order

"Governmental action does not automatically become reasonably related to the achievement of a legitimate and substantial government purpose by mere assertion." *Bates v. City of Little Rock*, 361 U.S. 516, 525 (1960). Where there are no specific indications that conduct falls outside the protection of the First Amendment, the government is not entitled to investigate the conduct. *Australia/Eastern U. S. A. Shipping Conference v. United States*, 1981 U.S. Dist. LEXIS 10121, at *50 (D.D.C. Dec. 23, 1981). "The intrusion is less justified in an investigation, where no alleged violations have been defined against which to measure the relevance of the disclosure, than it is in litigation." *Id.*

### B.    *Doe has a strong First Amendment interest in remaining anonymous*

Doe's First Amendment interest in anonymity is substantial. The disclosure of the identity of an anonymous speaker "is itself an irreparable harm." *Art of Living Found. v. Does*, 2011 U.S. Dist. LEXIS 129836 at *26-27 (N.D. Cal. 2011) (citing *Perry*, 591 F.3d at 1158).

The greatest protection is afforded when the anonymous speech is political in nature. *In re Anonymous Online Speakers)*, 661 F.3d 1168, 1173 (9th Cir. 2011) *accord Art of Living*, 2011 US Dist LEXIS 129836 at *16-17) (protecting "heated discussion and criticism" of matters that "impact the lives of many individuals," especially "governmental activities."). [4]

Then-Secretary of Homeland Security Secretary Kristi Noem used the term "violence" to include "anything that threatens [DHS agents] and their safety. It is doxing them. It is videotaping them where they're at." Koltun Declaration, ¶ 7, Exh. N. DHS Assistant Secretary

---

(2021) ("Exacting scrutiny is triggered by 'state action which may have the effect of curtailing the freedom to associate,' and by the 'possible deterrent effect' of disclosure, (quoting *NAACP* 357 U.S. at 460-461)).

[4]Even a less weighty First Amendment interest, such as commercial speech, may be sufficient to quash a subpoena. *See NLRB v. Midland Daily News*, 151 F.3d 472, 475 (6th Cir. 1998) (quashing administrative subpoena regarding anonymous employment advertisements, which would "chill the lawful commercial speech of periodicals and employers nationwide").

12

Motion to Quash Summons and for Prot. Order

for Public Affairs Tricia McLaughlin told the Center for Media and Democracy (CMD) that "videotaping ICE law enforcement and posting photos and videos of them online is doxing our agents," and added: "We will prosecute those who illegally harass ICE agents to the fullest extent of the law." *Id.*

For the reasons discussed further in section II.C, the "fullest extent of the law" does not cover Doe's anonymous speech. Because of such aggressive threats by the government, Doe quite reasonably fears that if stripped of immunity a prosecution would follow. Doe Decl., ¶ 7. Although such a prosecution would be frivolous, the burden on Doe to have to defend such a prosecution would be enormous.

Doe also wishes to avoid a personalized campaign of harassment by supporters of ICE/CBP. *Id.,* ¶ 8. To be sure, supporters and critics of ICE are perfectly entitled to conduct a robust debate, which need not be civil and may include highly unpleasant personal attacks and nonviolent protests. And the supporters of ICE and Agent Ross are entitled to attempt to learn the identity of their critics by means of public information. But neither they nor the government are entitled to use the coercive power of the government and of this Court to learn the identity of their critics.

Thus, on the threshold inquiry, Doe's First Amendment interests are quite substantial. In *Perry*, that threshold was satisfied by declarations that, although "lacking in particularity," were "consistent with the self-evident conclusion that important First Amendment interests were implicated," because they "create[d] a reasonable inference that disclosure would have the practical effects of discouraging political association and inhibiting internal ... communications that are essential to effective association and expression." 591 F.3d at 1163-64; *accord Whole Woman's Health,* 896 F.3d 362, 372, 375 (chilling effect of subpoena is "self-evident," would

13

Motion to Quash Summons and for Prot. Order

cause target to "retreat[] from the public square"); *Dole v. Serv. Employees Union, AFL-CIO, Local 280*, 950 F.2d 1456, 1459 (9th Cir. 1991); *Art of Living*, 2011 U.S. Dist. LEXIS 129836, at *28.

### C. *DHS cannot show an interest in identifying Doe sufficiently compelling to outweigh Doe's First Amendment Rights, especially since the conduct it purports to investigate is fully protected by the First Amendment*

#### 1. *Doe's Comment cannot be a violation of 18 U.S.C. § 119, because Ross's address was already public when Doe referenced it*

The summons does not specify what potential violation of law it is investigating. Since the Comment involved the disclosure of the home address of a federal agent, we will consider whether the Comment could constitute a violation of 18 U.S.C. § 119 ("Section 119"). That statute is aimed at protecting (among others) officers and employees of the United States. Section 119(b)(2)A) (referencing 18 U.S.C. § 1114.) Specifically, it makes it a crime to

> knowingly make[] restricted personal information about [such officers] …publicly available—
>
> (1) with the intent to threaten, intimidate, or incite the commission of a crime of violence against that covered person, … or
>
> (2) with the intent and knowledge that the restricted personal information will be used to threaten, intimidate, or facilitate the commission of a crime of violence against that covered person, …

Section 119(a). "Restricted personal information" includes "home address." Section 119(b)(1).

Doe did not "make" Ross's home address "publicly available." It was already publicly available long before that Comment; Doe learned it from public sources. Doe Decl., ¶ 2. The "genie [was] out of the bottle." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 & n.11 (2d Cir. 2004). "[W]hat has thus become public [cannot be made] private again." *Id.*

Moreover, Doe's stray comment reacting to a news item posted on a pro-ICE X feed cannot be deemed to have been made with the intent to threaten, intimidate, or incite violence

14

against Ross. Those terms must be read consistent with the First Amendment protections that are discussed in sections II.C.2-4 below. Thus, if Section 119 is read to cover Doe's Comment, the statute is unconstitutional. *See Sheehan v. Gregoire*, 272 F. Supp. 2d 1135, 1139 (W.D. Wash. 2003) (invalidating as unconstitutional Washington state statute that forbade publication of the home address of law-enforcement personnel with the "intent to harm or intimidate"); *Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1247 (N.D. Fla. 2010) (invalidating as unconstitutional statute that prohibits publication of home address of law enforcement officers "with intent to obstruct the due execution of the law or with the intent to intimidate, hinder, or interrupt any law enforcement officer in the legal performance of his or her duties"); *Publius v. Boyer-Vine*, 237 F. Supp. 3d 997 (E.D. Cal. 2017) (enjoining enforcement of similar statute concerning California legislators).

### 2.    *Doe's republication of truthful information concerning Ross is protected by the First Amendment*

The First Amendment protects the publication of truthful information lawfully obtained. *Smith v. Daily Mail Publishing Co.*, 443 U.S. 97, 105 (1979) (statute that barred media from publishing the names of juveniles named in indictments without court's permission violated the First Amendment). This is true even for highly personal information that is already in the public domain. *Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-9 (1975) (identity of rape victim).

Doe's republication of Ross's home address only disclosed true facts about him that had already become public due to the statements and actions of DHS.

The First Amendment's protection of the right to publish information obtained from public records includes information that was accidentally or inadvertently disclosed. *Florida Star v. B. J. F.*, 491 U.S. 524, 538-89 (1989) (newspaper could not be barred from publishing name of rape victim that had been wrongly released by police); *Okla. Publ'g Co. v. Dist. Ct.*, 430 U.S. 308, 311-12 (1977) (striking down injunction barring publication of name and photograph

15

of juvenile who appeared at pretrial proceeding that was supposed to be closed, but was not).

Thus, "doxing" a person by sharing "public information, while potentially offensive and disagreeable," is protected by the First Amendment. *United States v. Cook*, 472 F. Supp. 3d 326, 327 (N.D. Miss. 2020).

It is certain that Ross's address became known through publicly available information. But even if someone had illegally disclosed that information, that would not affect Doe's rights to repeat the information. When discussing matters of public concern, the First Amendment protects publication of such information even if the information had been independently leaked by a person who had herself violated the law in doing so. *Bartnicki v. Vopper*, 532 U.S. 514, 534-35 (2001). Thus, in *Alvarado v. KOB-TV, L.L.C.*, an unknown person leaked the fact that certain individuals were undercover policemen, information that allegedly threatened their lives and those of their families. *Id.* 493 F.3d 1210, 1213-14 (10th Cir. 2007). Nevertheless the First Amendment protected the right of the media to disclose their identities because the question whether the policemen were guilty of misconduct was an issue of public concern. *Id.* at 1219-20; *accord Sheehan*, 272 F.Supp.2d at 1143. *Cf. State ex rel. Cin. Enquirer v. Shanahan*, 2022-Ohio-448, ¶¶ 35-42 (Even if police officer demonstrated that identifying him would put him in personal danger, he would not be allowed to proceed pseudonymously where his identity could be gleaned from public information).

### 3.    *Doe's Comment did not constitute a "true threat" to Ross*

Many statements that may be considered "threatening" in some vague, colloquial sense are protected by the First Amendment, for example, " jests, "hyperbole,' or other statements that when taken in context do not convey a real possibility that violence will follow." *Counterman v. Colorado*, 600 U.S. 66, 74 (2023) (citation omitted). Only "true threats" are unprotected by the First Amendment; in other words "serious expression[s]" conveying that a speaker means to "commit an act of unlawful violence." *Id.*. For example, in *Watts v. United States*, the defendant, speaking at an anti-Vietnam war rally, stated that he had just been drafted but that he was "not

16

going[; i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J.... they are not going to make me kill my black brothers." *Id.*, 394 U.S. 705, 706 (1968). The Supreme Court held that the statement should not be understood as a true threat, given the context of the overall antiwar speech," given that "debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 708.

In *Cook*, the defendant had been prosecuted and acquitted of drug possession. He had subsequently made postings on Facebook concerning his public defenders, the judges, and law enforcement agents involved in the case, essentially contending that he had been the victim of a fraudulent indictment scheme. For example: ""you are finished [, b]ecause I'm coming and hell is coming with me," and disclosing the identity of undercover agents and the names of his family members, along with a statement that "God willing I'm going to take them out." *Id.*, 472 F. Supp. 3d at 330-331. The court ruled that the Facebook posts "lack entirely the specificity required" to be considered a "true threat." *Id.* at 335. "When read in context, Cook's posts are nothing more than a manifesto of his grievances regarding people and processes which he perceived to have wronged him." *Id.* On the contrary, his comments were protected speech because they could "be fairly considered as relating to any matter of political, social, or other concern to the community." *Id.* at 336 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). "[W]here speech 'complained of misconduct within the police department,' it should be classified as speech addressing a matter of public concern." *Id.* (citing *Thompson v. City of Starkville, Miss.*, 901 F.2d 456, 463 (5th Cir. 1990) and *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988)).

### 4.    *Doe's Comment cannot be deemed to have incited others to harm Ross*

The "the mere tendency of speech to encourage unlawful acts [is not] sufficient reason for banning it." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). Although the term "incitement" is used broadly in everyday speech, in the context of the First Amendment only a

17

narrowly proscribed set of speech is considered an incitement to violence that falls outside the protections of the constitution. The test was set out in *Brandenburg v. Ohio*, 395 U.S. 444, (1969). The "constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Id.* at 447. Thus, the First Amendment will protect speech, even speech that advocates violence, unless it meets all of the following tests: "(1) the speech explicitly or implicitly encouraged the use of violence or lawless action, (2) the speaker intends that his speech will result in the use of violence or lawless action, and (3) the imminent use of violence or lawless action is the likely result of his speech." *Nwanguma v. Trump*, 903 F.3d 604, 609 (6th Cir. 2018).

"The crucial element to lowering the first amendment shield is the imminence of the threatened evil." *Herceg v. Hustler Magazine, Inc.*, 814 F.2d 1017, 1022 (5th Cir. 1987). "Incitement cases usually concern a state effort to punish the arousal of a crowd to commit a criminal action." *Id.* at 1023.

Even where the speaker is whipping up a crowd, the *Brandenburg* test may not be met. In *Nwanguma,* plaintiffs were protesters who appeared at a rally for then-candidate-for-President Trump. Mr. Trump on five different occasions called upon his supporters to "Get em' out of here," whereupon the protesters were allegedly assaulted, pushed and shoved. *Id.* at 607. The court held that the First Amendment immunized Mr. Trump from any liability for such violence. *Id.* at 606. The Court reasoned that, first, although "Trump's words may *arguably* have had a tendency to encourage unlawful use of force, [] they did not specifically advocate for listeners to take unlawful action and are therefore protected." *Nwanguma*, 903 F.3d at 610 (6th Cir. 2018) (original emphasis). Second, Mr. Trump had also admonished his supporters: "don't hurt 'em," which "undercut the alleged violence-inciting sense of Trump's words." *Id.* at 611-12.

Here, by contrast, Doe was not whipping up a crowd, but rather making a sarcastic comment, one of thousands in the ongoing national debate over whether Ross was a hero or a

Motion to Quash Summons and for Prot. Order

villain. Even if Doe had gone further and advocated violence against Ross, that could not have met the requirement that the violence be imminent. Moreover, those who were upset by Ross's shooting of Ms. Good would have a First Amendment right to protest at his home, no matter how unpleasant Ross might find that. *See Sheehan*, 272 F. Supp. 2d at 1145; *accord Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244, 1249 (N.D. Fla. 2010) (The publication of truthful personal information about police officers is linked to the issue of police accountability through aiding in achieving service of process, researching criminal history of officers, ***organizing lawful pickets***, and other peaceful and lawful forms of civic involvement that publicize the issue.)(emphasis added).

19

## CONCLUSION

Doe's anonymous speech has violated no law, and indeed the Comment is fully protected by the First Amendment.  Even if that were not the case, DHS has no authority to use a Section1509 summons to strip Doe of anonymity.  Therefore, the summons should be quashed, and this Court should order that government not seek to discover Doe's identity without leave of this Court.[5]

Respectfully submitted,

April 6, 2026

*Erica B. Giese w/permission*
Erica Benites Giese

Robert P. Latham, Esq.
**JACKSON WALKER L.L.P.**
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6095

Erica Benites Giese, Esq.
**JACKSON WALKER L.L.P.**
1900 Broadway, Suite 1200
San Antonio, Texas 78215
Telephone: (210) 978-7791

Joshua Koltun (Cal. Bar No. 173040)
One Sansome Street
Suite 1400, No. 2544
San Francisco, California  94104
Telephone:  (415) 680-3410
*Application pro hac vice to be made forthwith*

**Attorneys for Doe/podslurp**

---

[5] A proposed order is forthcoming and will be filed by Movant via CM/ECF.

20

Motion to Quash Summons and for Prot. Order